Charles D. STURGEON, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–9805–CR–307.

Supreme Court of Indiana.

Nov. 18, 1999.

1174

.John Pinnow, Greenwood, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, James A. Garrard, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Charles D. Sturgeon raises interesting questions about when the motive to fabricate arises for purposes of Indiana Evidence Rule 801, what proof is necessary to warrant a change of judge in criminal cases, and others. Ultimately, we find these claims unavailing.

### Facts and Procedural History

Sturgeon was found guilty on three counts: murder, felony murder, and robbery as a class A felony. The court sentenced him to life imprisonment without parole for murder, with a twenty year consecutive sentence for robbery, entered as a class B felony. The court also merged the conviction for felony murder with the murder conviction.

On March 4, 1995, Sturgeon, James Coffman, and several of their co-workers went to the Puck Around bar and the Bungalow Inn after work. At some point, Sturgeon called his girlfriend, Leslie Hauk, and she came to the Bungalow Inn. Sturgeon also called Gregory Anderson and asked him to pick up some drugs for the group.

Later that evening, Sturgeon and Coffman drove to Sturgeon's house. Sturgeon went inside, while Coffman remained in his

car, sleeping. Sturgeon again called Anderson, and Anderson came to the house. When Anderson arrived, Sturgeon told him that he planned to rob Coffman, who had about $800 in cash on him. Coffman eventually awakened and went into Sturgeon's house. Anderson made two drug runs for Sturgeon and Coffman, then left.

The next morning, Sturgeon again called Anderson requesting drugs. Anderson went to Sturgeon's home and Sturgeon, Coffman, and Hauk were there when he arrived. Hauk gave Anderson money, and Anderson left to get drugs. When Anderson returned, no one answered the door and the cars that had been in the driveway were gone. That evening, Sturgeon went to Anderson's home and told him that Hauk had a fight with Coffman, during which Hauk stabbed Coffman with a knife and Coffman took the knife from her. Sturgeon said that he had then had to "mess [Coffman] up." (R. at 1446–47.)

Over the next two days, Sturgeon did not go to work, but Anderson saw him driving Coffman's car. After making another drug run for Sturgeon, Anderson went to Sturgeon's home. Telling Anderson, "you can handle this," Sturgeon allowed Anderson to enter his home, where Anderson saw Coffman's dead body on the floor. (R. at 1453–54.) Sturgeon then asked Anderson to help him move the body out of the house. The two men carried the body to Coffman's car and placed it in the trunk, hitting the legs with a tire iron or crowbar in order to make the body fit. Sturgeon drove the car away. On Wednesday, March 18, 1995, Coffman's son located the car in a parking lot about one block from the office where Coffman and Sturgeon had worked; he found Coffman's body inside.

Coffman had some twelve stab wounds in the right side of his back and five or six blunt force injuries to his head. The head injuries were caused by an object with a distinctive geometric shape, consistent with a crowbar. The wounds on Coffman's head and back had occurred about the same time and were likely inflicted by two people. The combination of wounds caused Coffman's death. No money was found in the car.

Later, two police detectives went to Sturgeon's house to question him. When they arrived, Sturgeon and several friends were cleaning the living room and taking up the carpet. After some questioning, Sturgeon consented to a search of his home. The search revealed blood on top of a table and blood spatters on a wall calendar which were consistent with a beating or stabbing. The blood on the table matched Hauk, while the blood stains on the calendar matched Coffman. An evidence technician also located swipe marks on the wall and it appeared that someone had cleaned the storm door.

On Sunday, March 5th, Hauk was arrested for driving while intoxicated after causing a traffic accident. She had blood on her pants and shoes and a blood stain on the back of her t-shirt. The blood matched both Hauk and Coffman. The police also found a bloody knife in the back of her car; the blood on the knife matched Coffman.

## I. Evidence of Prior Statement

The State called Gregory Anderson to testify at trial about events surrounding Coffman's murder. Anderson testified that Sturgeon told him "Hauk had started to mess with Coffman and that he [Sturgeon] had to mess [Coffman] up." (R. at 1446–47.) Sturgeon also said that "[Hauk] had started this" and "he had to finish it." (R. at 1454.) Anderson further testified that he helped Sturgeon move the body from Sturgeon's home to the trunk of Coffman's car. On cross-examination, the defense impeached Anderson with inconsistencies between his trial testimony and a police statement given on March 11, 1995. The defense also implied that Anderson's testimony was influenced by favorable

treatment from the State.[1] In response, the State offered Anderson's March 11th statement as evidence of a prior consistent statement. Sturgeon contends that the testimony was inadmissible under the prior consistent statement rule because, at the time Anderson made the statement, he had a motive to fabricate.

 Under Indiana Evidence Rule 801(d)(1)(B), a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is "consistent with the declarant's testimony, offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, and made before the motive to fabricate arose...." Ind. Evidence Rule 801(d)(1)(B); see also Evans v. State, 643 N.E.2d 877, 882–83 (Ind.1994). We review trial court rulings on the admissibility of arguably hearsay statements for abuse of discretion. Horan v. State, 682 N.E.2d 502, 511 (Ind.1997).

Sturgeon clearly challenged Anderson's credibility with inconsistencies between Anderson's prior statement and his trial testimony. Sturgeon further implied that Anderson's testimony was influenced by favorable treatment from the State. Also, Anderson's police statement was consistent with his trial testimony and offered to rebut Sturgeon's charges of recent fabrication and improper influence. The remaining question is whether Anderson's statement was made before the alleged improper motive to fabricate arose. Since Anderson was involved in the circumstances of the crime both before and after the crime occurred, Sturgeon asserts that Anderson had motive to shift blame away from himself and toward Sturgeon when questioned by the police. (Appellant's Br. at 32.)

Sturgeon relies upon Bouye v. State, 699 N.E.2d 620 (Ind.1998), and Thompson v. State, 690 N.E.2d 224 (Ind.1997). In Bouye, the trial court admitted a prior statement by the defendant's co-conspirator implicating the defendant in a murder. The co-conspirator had already been arrested in connection with the murder when he made the statement. Bouye, 699 N.E.2d at 624–25. A few months later, the co-conspirator pled guilty pursuant to a plea agreement with the State and agreed to testify against Bouye. Id. at 625. After being impeached by the defendant at trial, the co-conspirator's second statement was admitted and was identical to his trial testimony. Id. Bouye objected to the admission of his co-conspirator's prior statement, asserting the statement was made when the co-conspirator had a motive to fabricate. This Court agreed the "statement was made after his motive to fabricate arose and, therefore, the statement ... does not qualify under Rule 801(d)(1) for exclusion from the definition of hearsay evidence." Id. at 626.

In Thompson, the court admitted a statement made by the defendant's alleged co-conspirator, Percy, through the testimony of Percy's friend. Thompson, 690 N.E.2d at 232. This statement implicated the defendant in a murder and was offered to rebut the defendant's charge of improper motive. Id. at 232 n. 8. Although this Court determined the statement was inadmissible on relevancy grounds, we also noted:

> To be admissible under [801(d)(1)(B) ], Percy's motive to fabricate had to have arisen after the prior statement was made. Arguably this prerequisite is not satisfied here. Percy's motive to implicate Thompson arose instantaneously because Percy essentially admitted to an accomplice role in the murders; Percy had every reason to shift culpability to Thompson while minimizing his own involvement.

Id.

The State contends Anderson's statement was given before his motive to fabri-

---

1. Anderson was charged with assisting a criminal, a class C felony, under Ind.Code § 35–44–3–2. He pled guilty to this charge and agreed to testify against Sturgeon in exchange for a reduced sentence. (R. at 1462, 1465–69.)

cate arose because the statement was given before the State levied charges against him. (Appellee's Br. at 12.) In so contending, the State relies on *Evans*, 643 N.E.2d 877. In that case, Evans sold drugs to Decker. Decker's statement implicating Evans was admitted at trial to rebut charges of improper motive. *Id.* at 881. Decker made the statement after he had been arrested, but before reaching a plea agreement with the State. *Id.* The defendant objected to the statement as hearsay. *Id.* We disagreed and held the statement was admissible under Rule 801(d)(1)(B). In so holding, we stated: "Decker's statement to the police came before he reached a plea agreement with the State and so satisfies all of the requirements for admission under Rule 801(d)(1)(B)." *Id.* at 883. Based on this reasoning, the State now argues Anderson's statement was given before a motive to fabricate arose because the statement was made before the State levied charges against Anderson and well before he pled guilty or entered into a plea bargain.

We cannot agree with the State that *Evans* stands for the proposition that a motive to fabricate arises *only* where the declarant has been charged, pled guilty, or entered into a plea bargaining agreement. Nor do we agree with Sturgeon that *Bouye* and *Thompson* require us to find a motive to fabricate, automatically, at the time the crime occurred or where the declarant has been questioned by the police in connection with the matter. Rather, whether a motive to fabricate has arisen remains a fact-sensitive issue.

A review of our case law reveals that most of the opinions addressing the timing of a motive to fabricate involve two situations: (1) where the declarant was the victim, *see, e.g., Craig v. State*, 630 N.E.2d

207 (Ind.1994); *Parmley v. State*, 699 N.E.2d 288 (Ind.Ct.App.1998), *trans. denied; Caley v. State*, 650 N.E.2d 54 (Ind. Ct.App.1995), *trans. denied; Marshall v. State*, 643 N.E.2d 957 (Ind.Ct.App.1994), *trans. denied; Allen v. State*, 636 N.E.2d 190 (Ind.Ct.App.1994), *trans. denied,* or (2) where the declarant was the defendant or equally culpable to the defendant in the crime, *see, e.g., Bouye,* 699 N.E.2d 620; *Thompson,* 690 N.E.2d 224; *Brown v. State,* 671 N.E.2d 401 (Ind.1996); *Willoughby v. State,* 660 N.E.2d 570 (Ind. 1996); *Evans,* 643 N.E.2d 877; *see also United States v. Fulford,* 980 F.2d 1110 (7th Cir.1992); *United States v. Lewis,* 954 F.2d 1386 (7th Cir.1992); *United States v. Davis,* 890 F.2d 1373 (7th Cir.1989), *cert. denied,* 493 U.S. 1092, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990).

Here, Anderson was neither a victim, nor an accomplice in Coffman's murder. He was, however, involved in the events leading up to Coffman's death, and he assisted Sturgeon in moving the body and removing evidence following the murder.

Among the advantages we have gained by adopting our rules of evidence is a greater ability to receive wisdom from elsewhere. Thus, we turn to other jurisdictions in an effort to find cases similar to ours.

In *State v. Brown,* 126 N.M. 338, 969 P.2d 313 (1998), defendants Brown and Smith were convicted of murder and conspiracy to commit murder. Lucero was a main witness for the prosecution. *Id.* at 317. At trial, Lucero's prior statements to a third party were admitted to rebut charges of improper influence flowing from prosecutorial immunity pursuant to New Mexico's version of Rule 801(d)(1)(B).[2] The defendants objected to the statements, arguing that Lucero made them when he

---

**2.** Although New Mexico's Rule of Evidence 11–801(D)(1)(b) did not contain the requirement that the statement be made before the motive to fabricate arose, the New Mexico Supreme Court had previously adopted the requirement that "only those statements made before the motive originated are non-hearsay and therefore admissible." *State v. Casaus,* 121 N.M. 481, 913 P.2d 669, 675 (App.1996).

had a motive to fabricate. *Id.* at 323. The evidence presented at trial regarding Lucero's involvement in the murder was conflicting. The murder took place at Lucero's house while he was in the room and he admitted to helping dispose of the body. A search of Lucero's home revealed a hammerhead, plastic garbage bags, duct tape, and cords, all of which could have been used in the murder. *Id.* at 324. At trial, a witness testified that Lucero admitted killing the victim. *Id.* Lucero maintained, however, that he was not involved in the murder. *Id.* at 317–18. Based on the foregoing, the defendants argued Lucero had a motive to fabricate from the date of the murder.

In analyzing the timing of the motive to fabricate, the New Mexico Supreme Court observed:

> It may be argued that a declarant whom a defendant accuses of being involved in the crime and who witnesses that crime may possess a motive to fabricate as soon as the crime takes place because he or she fears prosecution. We cannot so conclude without eviscerating the rule. While we may recognize that a declarant may have a motive to lie immediately following the crime, due to the declarant's involvement in the crime, failure to report the crime, and fear of prosecution, such a conclusion must necessarily be a fact-based inquiry. The mere witnessing of a crime does not give rise to a presumption or conclusion that a motive to fabricate existed at the time of the crime.

*Id.* at 324. Based on the evidence adduced at trial, the court concluded "that Lucero had a powerful motive to lie because of his involvement in the murder and the police suspicion that had begun to focus on him." *Id.*

Turning to the present case, Sturgeon argues that Anderson had a motive to fabricate because Anderson, by his own account, bought drugs for Coffman prior to the murder and drove Coffman's car to get drugs. Following the murder, Anderson helped move Coffman's body. Also, the police informed Anderson that he could be charged in connection with Coffman's murder before he gave the statement. Thus, Sturgeon argues, Anderson's involvement before Coffman's death and the events following the death provided him with a motive to fabricate, at least from the moment he helped move Coffman's body. (Appellant's Br. at 34.)

■ The purpose behind the temporal requirement in 801(d)(1)(B) has been explained as follows: " '[T]he prior consistent statement has no relevancy to refute the charge [of recent fabrication] unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated.' " *Tome v. United States*, 513 U.S. 150, 156, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995) (quoting E. Cleary, *McCormick on Evidence* § 49 (2d ed.1972)). Indeed, the fact that the declarant's story did not change from the time he was questioned until trial does nothing to rebut the charge of recent fabrication or bias if the declarant already had a motive to lie when he made the initial statement. We agree with the New Mexico Supreme Court that every person involved in the criminal activity at issue or who witnesses a crime arguably has a motive to fabricate for fear of prosecution for his involvement or for failing to report the crime. New Mexico is also right to observe that automatically imputing a motive to fabricate might so envelop the prior consistent statement rule as to prevent the admission of the prior statement of any person able to provide first-hand knowledge of the crime.

In cases where the declarant was the defendant or co-defendant, we have been willing to conclude that a motive to fabricate likely arises immediately upon the commission of the crime. *See Bouye*, 699 N.E.2d 620; *Thompson*, 690 N.E.2d 224. In a case where the declarant became involved in the crime after it was committed, however, the role of timing is not as clear.

Our review of the record reveals no evidence implicating Anderson in Coffman's murder, only evidence that Anderson sold drugs to Coffman earlier in the evening of the murder and assisted Sturgeon following the murder.[3] We acknowledge the possibility of a motive to fabricate on Anderson's part since he knew he could be charged in connection with the murder and since he participated in certain criminal acts surrounding the murder. However, there is no evidence tending to implicate Anderson in Coffman's murder and therefore no evidence he had a motive to lie about Sturgeon's involvement when questioned. Without any concrete evidence to this effect, we cannot conclude the trial court abused its discretion in admitting Anderson's prior consistent statement.

## II. Motion for Change of Judge

Sturgeon asserts the trial court erred in denying his motion for change of judge under Indiana Criminal Rule 12(B). Prior to trial, Sturgeon filed a verified motion for change of judge along with a copy of Hauk's sentencing transcript, and the trial court denied the motion. In an affidavit in support of his motion for change of judge, Sturgeon recited the following historical facts:

> 3. That the Honorable Jane Magnus[-]Stinson, presiding judge of this Court should be disqualified and a special judge appointed ... because this Judge has shown prejudice to the defendant which is shown by the Judge's comment during sentencing of Leslie Hauk that it is the judges [sic] belief that Leslie Hauk and Charles Sturgeon

worked together to kill the victim, James Coffman.

(R. at 713.) During Hauk's sentencing hearing, the trial judge made the following observations:

> I see on your [Hauk's] part other efforts at manipulation that I want to discuss.... One, that you and Mr. Sturgeon had planned his [Coffman's], his death, and, two, that you were already attempting to create an alibi for yourself and deflect blame to Mr. Sturgeon before anything really happened to Mr. Coffman.... The jurors felt very strongly that you chose your own company, and I didn't let it come in at trial, but it sort of did come in about Mr. Sturgeon's history. I was trying to keep it out, but it did come in, and, yes, he was seen as a bad guy by your jury, ... On accomplice liability, I do think the jury believed that Mr. Sturgeon was the more culpable....

(R. at 740–42.) Sturgeon argues that these comments support a rational inference of prejudice since the judge had already made conclusions on the merits of Sturgeon's case. (Appellant's Br. at 38–39.)

The State suggests that the judge was not required to recuse herself because she assured Sturgeon she had no personal bias against him by stating: "I intend to give Mr. Sturgeon a fair trial.... [T]he Court has no personal bias against Mr. Sturgeon in this case." (R. at 1243.) Thus, the State argues, the trial judge adequately demonstrated her impartiality. (Appel-

---

**3.** In his Reply Brief, Appellant states: "There was sufficient evidence to establish Anderson may have participated in the murder based on Anderson's own testimony." (Appellant's Reply Br. at 3.) Appellant provides no record cite to support this statement, however and our review of the record and of Anderson's testimony reveals no such evidence.

At trial, during Anderson's cross-examination, the defense highlighted several inconsistencies between Anderson's testimony and his police statement in an obvious effort to portray that Anderson was present at the time of Coffman's murder. For example, defense counsel questioned Anderson regarding a gesture he made to the side of his head while discussing Coffman's wounds in an effort to show that Anderson must have been present when the wound was inflicted. (R. at 1473.) Defense counsel, however, was unable to elicit any testimony that placed Anderson at the scene of the murder when the murder occurred.

lee's Br. at 19.) This argument misses the essence of current Rule 12.

█ Under former provisions of Rule 12, the burden rested on the defendant to establish actual personal bias, such bias being shown by the judge's conduct. *Smith v. State*, 535 N.E.2d 1155 (Ind.1989). Under the current rule,[4] a defendant may request a change of judge for bias or prejudice by filing an affidavit that the judge has a personal bias or prejudice against a party and stating the facts and reasons for the belief that such bias or prejudice exists. Ind.Crim. Rule 12(B). "The request shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice." *Id.*

█ Accordingly, a change of judge is neither "automatic" nor "discretionary." *Blanche v. State*, 690 N.E.2d 709, 714 (Ind. 1998) (citing *Whitehead v. Madison County Circuit Court*, 626 N.E.2d 802, 803 (Ind. 1993) (interpreting identical language governing a motion for change of judge in post-conviction proceedings)). In considering a motion for change of judge, the trial judge is required to examine the affidavit, treat the facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice. *Whitehead*, 626 N.E.2d at 803. This calls for a legal determination by the trial court. Contrary to the State's suggestion, a judge's declaration of non-prejudice plays no role in such an analysis. (Appellee's Br. at 15 (quoting (R. at 1243)).) In this respect, it stands on footing similar to a movant's belief in the judge's bias, which is not a "historical fact" as required by Criminal Rule 12(B).

Sturgeon's affidavit presents the following facts: (1) the trial judge presided over Hauk's sentencing hearing, and (2) she made comments during the hearing regarding Sturgeon's involvement in Coffman's murder. We therefore analyze these facts to determine whether they support a rational inference of prejudice or bias.

█ In *Whitehead*, we noted that the structure and substance of the post-conviction change of judge rule are similar to the methods used in federal courts, and that federal case law is helpful when addressing this issue. *Whitehead*, 626 N.E.2d at 803. Generally, a trial judge's exposure to evidence through judicial sources is, alone, insufficient to establish bias. *See Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir.1994), *cert. denied*, 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995). For example, in *Paradis*, the trial judge presided over the trial of Paradis' confederate and sentenced the confederate to death before presiding over Paradis' trial. *Id.* Paradis asserted the trial judge was biased against him based on facts presented at the confederate's trial. *Id.* at 957–58. The Ninth Circuit disagreed holding "[t]he fact that [the trial judge] heard evidence presented at [the other] trial does not demonstrate that he failed to act impartially or appeared to act in a biased manner." *Id. See also United States v. Cowden*, 545 F.2d 257, 265–66 (1st Cir. 1976) (fact that judge presided over separate trial of co-defendant does not establish partiality), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977); *United States v. Morris*, 988 F.2d 1335, 1337 (4th Cir.1993) ("[T]he fact that the judge had previously presided over the criminal trial of a witness in this case and was involved in adjusting that witness's sentence did not create ... a problem. All of the district judge's prior dealings with [the witness] had been in the judicial context of presiding over court proceedings, and there simply was no basis for the district judge to have recused himself.").

With regard to comments made in response to information learned in judicial proceedings, the U.S. Supreme Court has stated:

---

**4.** The current version of Criminal Rule 12(B) became effective February 1, 1995.

[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, ... the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

We note that we have not previously taken the opportunity to address the issue of our standard of review under the new version of Criminal Rule 12. Under the former version, we held that abuse of discretion was the standard of review. *See, e.g., Isaacs v. State,* 659 N.E.2d 1036, 1043 (Ind.1995), *cert. denied,* 519 U.S. 879, 117 S.Ct. 205, 136 L.Ed.2d 140 (1996); *Harrington v. State,* 584 N.E.2d 558, 561 (Ind. 1992); *Perry,* 585 N.E.2d at 716. This standard of review reflected the discretionary nature of the previous version of the rule. Since Criminal Rule 12 is now neither "automatic" nor "discretionary," however, we conclude a different standard of review is appropriate.

■■■ We conclude that the appropriate standard of review of a trial judge's decision to grant or deny a motion for change of judge under Indiana Criminal Rule 12 is whether the judge's decision was clearly erroneous. Reversal will require a showing which leaves us with a definite and firm conviction that a mistake has been made. *Spranger v. State,* 650 N.E.2d 1117, 1119 (Ind.1995).[5]

The historical facts presented by Sturgeon did not support a rational inference of the trial judge's bias or prejudice. The trial judge's comments at Hauk's sentencing hearing merely constituted a characterization of the evidence presented at

Hauk's trial and did not indicate that she had reached a conclusion about the merits of Sturgeon's case. Further, the fact that she presided over Hauk's sentencing hearing and may have heard evidence involving Sturgeon does not, in itself, raise an inference of bias or prejudice. The trial judge's decision to deny Sturgeon's motion for change of judge was not clearly erroneous.

### III. Lesser Included Offense Instruction

■■■ Sturgeon finally contends the trial court erred in refusing to give his tendered instruction on assisting a criminal, as a lesser included offense of murder. To determine whether to instruct the jury on a lesser included offense of a charged crime, the court must employ the three-step test outlined in *Wright v. State,* 658 N.E.2d 563, 566–67 (Ind.1995). First, the court must compare the statute defining the crime charged with the statute defining the alleged lesser included offense to determine whether the lesser offense is "inherently included" in the crime charged. *Id.* at 566. The alleged lesser included offense is inherently included in the crime charged if the lesser included offense may be established " 'by proof of the same material elements or less than all the material elements.' " *Id.* (quoting Ind.Code Ann. § 35–41–1–16(1) (West 1998)).

■■■ If the court decides the alleged lesser included offense is not inherently included, it must then proceed to step two and decide whether the offense is "factually included" in the crime charged. *Id.* This determination involves comparing the statute defining the alleged lesser included offense with the charging instrument in the case. If the charging instrument alleges that the means used to commit the crime charged include all of the elements of the alleged lesser included offense, then

---

**5.** This is consistent with the approach we have taken in cases under the post-conviction rules, where we have used error rather than abuse of discretion as the touchstone for appellate review. *See, e.g., Harrison v. State,*

707 N.E.2d 767, 790 (Ind.1999) ("[T]he post-conviction court did not err by denying the motion for change of judge."); *Blanche,* 690 N.E.2d at 714 ("[D]enial of Appellant's motion for change of judge was not error.").

the alleged lesser included offense is factually included in the crime charged.

 Finally, if the court determines that the alleged lesser included offense is either inherently or factually included within the crime charged, then it must evaluate the evidence presented by both parties. If there is a serious evidentiary dispute about the elements distinguishing the greater offense from the lesser offense and "if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense." *Id.* If there is no meaningful evidence from which the jury could properly find the lesser offense was committed while the greater was not, however, then the court should not give the lesser included offense instruction. *Id.*

The parties here agree that the crime of assisting a criminal is not an inherently included offense of murder. (Appellant's Br. at 24; Appellee's Br. at 6); *see also Reynolds v. State,* 460 N.E.2d 506 (Ind. 1984). Sturgeon asserts, however, that the crime of assisting a criminal became factually included within the crime of murder when the trial court instructed the jury on accomplice liability. (Appellant's Br. at 25.)

 Under Ind.Code § 35–44–3–2, assisting a criminal is harboring, concealing, or otherwise assisting a person who has committed a crime or who is a fugitive from justice, with the intent to hinder the apprehension of that person, by one who is not the parent, child, or spouse of the criminal or fugitive. Our review of the charging information reveals that the elements of assisting a criminal were not alleged within it. The information did not allege that Sturgeon assisted Hauk with the intent to hinder her apprehension or punishment after Hauk committed murder. (R. at 51–52.) Rather, the information alleged:

COUNT I

Charles D. Sturgeon ... on or about March 5, 1995, did knowingly kill another human being, namely: James Coffman, by stabbing James Coffman multiple times with a deadly weapon, that is: a knife, at and against the person of James Coffman, thereby inflicting mortal stab wounds upon James Coffman, causing James Coffman to die;

COUNT II

Charles D. Sturgeon ... on or about March 5, 1995, did kill another human being, namely: James Coffman, while committing or attempting to commit Robbery, which is to knowingly take from the person or presence of James Coffman, property, that is: United States Currency, by putting James Coffman in fear or by using or threatening the use of force on James Coffman, and while committing or attempting to commit the above-described crime of Robbery, Charles D. Sturgeon ... did use a deadly weapon, that is: a knife, at and against the person of James Coffman, thereby inflicting mortal stab wounds upon James Coffman, causing James Coffman to die[.]

(R. at 51–52.) The charges do not allege conduct that would have constituted the separate offense of assisting a criminal. For this reason, assisting a criminal is not factually included in the offense of murder in this case.

 We also reject Sturgeon's contention that the trial court's decision to instruct the jury regarding accomplice liability somehow rendered the offense of assisting a criminal a factually included offense of murder. Here, the trial court instructed the jury on accomplice liability based on conflicting evidence of Hauk and Sturgeon's participation in Coffman's murder. (R. at 901–05; *see also* 1667–73.) Sturgeon correctly notes that, under Ind.Code § 35–41–2–4, the jury could have properly found him guilty of murder if it found that he aided, induced, or caused another to commit the offense.

(Appellant's Br. at 27.) According to Sturgeon, however, the evidence indicates he so associated himself with the crime by moving the body out of the house and cleaning up after the murder as to confuse the jury regarding the accomplice instruction. Sturgeon says: "The accomplice liability instructions could give the jury the impression that Sturgeon was guilty of murder if he aided Hauk or Anderson by moving the body and cleaning up after the murder." (Appellant's Br. at 27.) We disagree.

With regard to accomplice liability, the trial court gave standard instructions such as: "To aid is to knowingly support, help, or assist in the commission of a crime." (R. at 903–05.) The trial court's decision to instruct the jury on accomplice liability did not imply that Sturgeon could be found guilty of murder for acts committed after Coffman was killed. Further, the language of the charging information makes it clear that Sturgeon was charged with murder and felony murder, not with assisting a criminal. Accordingly, the trial court did not err in refusing to instruct on assisting a criminal.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN and BOEHM, JJ., concur.